**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| THE S.O. BEACH CORP. and LARIOS ON THE BEACH, INC., | Civil Action No. 17-cv-22254-FAM |
| Plaintiffs, | |
| v. | |
| GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, | |
| Defendant. | |

_____

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
_____

MOUND COTTON WOLLAN & GREENGRASS LLP
William D. Wilson, Esq. (Fla. Bar No. 71202)
wwilson@moundcoton.com
30A Vreeland Road
Florham Park, NJ 07932
Tel. (973) 494-0600
Fax (973) 242-4244

Brian M. McKell, Esq. (Fla. Bar No. 975753)
bmckell@moundcotton.com
Lionel F. Rivera, Esq. (Fla. Bar No. 88795)
lrivera@moundcotton.com
Brooke D. Oransky (Fla. Bar No. 113049)
boransky@moundcotton.com
101 N.E. Third Avenue, Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-5800
Fax (954) 467-5880

Attorneys for Defendant
Great American Insurance Company of New York

## <u>TABLE OF CONTENTS</u>

Preliminary Statement...................................................................................................... 1

Statement of Facts ........................................................................................................... 1

Legal Argument ............................................................................................................... 5

        Point I:    The Fact That Great American Conducted a Loss Prevention
                     Inspection Does Not Preclude It From Asserting Certain
                     Defenses ..................................................................................................5

        Point II:   The Damage Did Not Commence During the Policy Period and
                     the Loss Was Not Fortuitous............................................................8

        Point III:  Coverage is Barred Because Plaintiffs Misrepresented and/or
                     Concealed Facts During the Adjustment of the Loss......................................11

Conclusion ..................................................................................................................... 14

## PRELIMINARY STATEMENT

Defendant Great American Insurance Company of New York ("Great American") submits this memorandum of law in opposition to the motion for partial summary judgment filed by plaintiffs The S.O. Beach Corp. and Larios On the Beach, Inc. (collectively, "Plaintiffs"). Plaintiffs' motion is based on a loss prevention inspection conducted by Great American in May 2011, two years before Plaintiffs reported any loss.  As explained below, the fact that a loss prevention inspection was conducted in 2011 has little or no relevance.

## STATEMENT OF FACTS

In 2008/2009, a 40-year recertification of the property located at 820 Ocean Drive, Miami Beach, Florida (the "Premises") was conducted.  [D.E. 37-2.]  The engineer that performed the inspection concluded that the Premises were in "good condition" and he did not notice any issues with the structure.  [D.E. 37-2.]  However, something very important happened between May 29, 2009, the date of the recertification report, and August 2010.  In August 2010, Plaintiffs retained Optimus Structural Design LLC ("Optimus"), a structural engineering firm, "to conduct a visual inspection at the [Premises] to evaluate existing conditions of the structural components of the Existing Building."[1] [D.E. 79-3, at page 3.]

Optimus inspected the Premises between August 17, 2010, and September 3, 2010, and found significant structural issues, including "signs of settlement and severe deflections," uneven door frames, cracks in walls, and floors that "felt bouncy." [D.E. 79-3, at pages 3-4.]  In its September 3, 2010 report, Optimus advised Plaintiffs that "[t]he current condition of the interior framing which has signs of severe deflections has to be addressed as soon as possible." [D.E. 79-

---

[1]  We do not know what triggered the hiring of Optimus because Plaintiffs have refused to produce documents from this time period.  Indeed, they actually withheld the Optimus report and all related documents.  Great American first became aware of Optimus's involvement when a third party produced the 2010 Optimus report in response to a subpoena.

3, at page 4.]

Thus, there is no question that as of August 2010, Plaintiffs knew that significant damage had occurred at the Premises.  What was not clear was what caused that damage.  Initially, it was believed that the damage was caused by the overloading of the first and second floors of the building with kitchen fixtures and related equipment. [D.E. 79-3.]  However, Optimus needed to do further evaluation to determine what was causing the problem. [D.E. 79-5, 18:24-19:16, 22:9-18, 26:23-27:11, 29:4-15.]

Effective March 1, 2011, Great American issued a policy of insurance covering the Premises.[2]  On May 11, 2011, a loss prevention consultant conducted an inspection of the Premises, checking off a number of boxes on an inspection form and adding some text.  [D.E. 37-1.]  He also took a number of photographs during his inspection.  [D.E. 76-1.]  There is no indication in the report that the consultant inspected the crawl space[3] under the Premises or that he observed any of the damage observed by Optimus.[4]  [D.E. 37-1.]

In February 2012, Plaintiffs requested that Optimus "furnish structural engineering services for the existing [Premises] which will consist of the design of required structural repairs for the deteriorated existing structural elements uncovered during [the] inspection process and outlined in [its] inspection report dated September 3, 2010."  [D.E. 79-4; D.E. 79-23.]  Tanya

---

[2] That policy is not at issue in this action.

[3] The crawl space is only 18 to 24 inches high.  Photographs taken during the renovations after the first floor was removed show how tight the crawl space is.  (Wilson Dec., Exhibits G and H.)

[4] Optimus noted in its 2010 inspection report that the restaurant was recently renovated and it "did not observe signs of cracking in floors or walls in the recently installed materials."  [D.E.79-3, at page 4.]  It is not known if any additional cosmetic repairs were made between August 2010, when Optimus conducted its inspection, and May 2011, which is when the loss prevention survey was conducted, because Plaintiffs have refused to produce documents from this time period.  Photographs taken in 2013 show that Plaintiffs did in fact patch various cracks. [D.E. 79-13, at pages 50-53, Photographs 458 – 53.]  Any repairs obviously would mask the damage.

Homleid, P.E., of Optimus, testified in her deposition that Optimus was asked to come back in 2012 "to design further details to address what [Optimus] observed early in 2010." [D.E. 79-5, 37:19-22.]   Optimus re-inspected the Premises on April 26, 2012, and observed that "[a]ll existing joists and 1x6 T&G wood sheathing in both kitchens are deteriorated (rotted) and require replacement."   [D.E. 79-6.]   According to Ms. Homleid, the condition of the Premises had deteriorated between September 2010 and April 2012. [D.E. 79-5, 78:17-23.]   In light of the then-existing condition of the Premises, shoring was put into place to prevent further damage. [D.E. 79-19.]

Optimus was later terminated and replaced by Hillman Engineering, Inc. ("Hillman Engineering"), another structural engineering firm.   [D.E. 79-8.]   Hillman Engineering was asked to come to the Premises "because of a failure in the kitchen, not an overloading … ." [D.E. 79-18, 125:19-126:17.]   Hillman Engineering inspected the Premises on October 18, 2012, and observed "sagging joists and areas of decking which are completely rotted out."   [D.E. 79-9.] Photographs taken by Hillman Engineering in March 2013 show a portion of the first floor that was "completely rotted out."[5]   (*See* Declaration of William D. Wilson, dated January 12, 2017 ["Wilson Dec."], Exhibit A.)   Hillman Engineering also determined that the shoring that had already been put into place due to the discovery of a "rotted out joist"[6] was not sufficient.   [D.E. 79-9; 79-18, 61:15-62:21, 68:6-25, 126:6-17; D.E. 79-20, 97:3-23.]

On March 1, 2013, the only insurance policy at issue in this action went into effect ("the Policy").   [D.E. 1-2, page 7, ¶8.]   The Policy provides coverage for "loss or damage commencing

---

[5] Unfortunately, Hillman Engineering destroyed its file, including the photographs depicting the condition of the Premises.   However, two of those photographs were sent to Revuelta Architecture International and produced pursuant to subpoena.

[6] A photograph taken by Great American's consultant in May 2013 shows shoring placed under a floor joist that is completely rotted out.   [D.E. 79-3, at page 35, Photograph 18.]

… during the policy period …," which began on March 1, 2013 and ended on March 1, 2014. [D.E. 1-2, page 33, ¶H.]

Hillman Engineering was later terminated and a third structural engineering firm, Thomas Moe, Inc. d/b/a THM Structural Consulting ("THM"), was retained to inspect the damage to the Premises and prepare a remediation plan. [D.E. 79-10, 14:9-19.] In its initial proposal, dated April 10, 2013, THM noted:

> The scope of our work will be to identify the cause of the structural deficiencies within the 3-story building specifically related to the interior of the structure. Visual observation of the current issues included: sagging, tilting and deflection of interior floors and corridors; cracking of interior walls within corridors.

(*See* Wilson Dec., Exhibit B.) Those are essentially the same observations made by Optimus in 2010. [D.E. 79-3.]

THM ultimately recommended that the Premises be evacuated after some of the walls and floors were opened up and damage to the sill plates, among other things, was observed. [D.E. 79-10, 16:13-17, 88:1-17.] The additional damage was not observable until the walls and floors had been opened up. [D.E. 79-7, 29:19-31:4.] According to Henry Hillman, you could not observe the sill plates, which were later determined to be deteriorated, by looking into the crawl space "because the beams would be in the way." [D.E. 79-18, 105:7-14, 128:18-129:2.]

The work THM was retained to perform was separated into three phases, with the initial inspection and identification of structural issues considered phase one. (Wilson Dec. Exhibit B.) Phase two consisted of, among other things, the "[d]esign of new floor joists to replace deteriorated joists" and "[r]epair/replacement of bearing wood stud wall as required." (*Id.*, Exhibit C.) Phase three consisted of construction administration. (*Id.*)

4

## LEGAL ARGUMENT

### POINT I

### THE FACT THAT GREAT AMERICAN CONDUCTED A LOSS PREVENTION INSPECTION DOES NOT PRECLUDE IT FROM ASSERTING CERTAIN DEFENSES

Plaintiffs claim that Great American is precluded from relying on certain defenses because it conducted a loss prevention inspection in March 2011.  For the most part, the cases relied on by Plaintiffs to support this argument concern application of Fla. St. §627.409, or its predecessor, Fla St. §627.01081, which allows insurers to rescind a policy *ab initio*, and thereby avoid coverage for a loss, based on misrepresentations in the application for insurance.  *See, e.g., Beach Bars USA, LLC v. Indem. Ins. Corp.*, 2014 WL 12469970 (S.D. Fla. Sept. 30, 2014); *LeMaster v. USAA Life Ins. Co.*, 922 F. Supp. 581 (M.D. Fla. 1996); *Columbian Nat. Life Is. Co. v. Lanigan*, 154 Fla. 760 (1944).  Under Florida law, "forfeitures of insurance policies are not favored, especially when the event that gives rise to the insurer's liability has occurred." *LeMaster*, 922 F. Supp. at 585; *Wimberg v. Chandler*, 986 F. Supp. 1447, 1455 (M.D. Fla. 1997). Thus, such claims are closely scrutinized by courts.

In order for an insurer to avoid coverage in such circumstances, it must establish that it detrimentally relied on the applicant's misrepresentations and that the misrepresentations were material.  *See, e.g., Douglas v. Mut. Life. Ins. Co.*, 191 So.2d 483, 485 (Fla. 2nd DCA 1966); *World Ins. Co. v. Posey*, 227 So. 2d 67, 69 (Fla. 4th DCA 1969) ("Proof of reliance upon a misrepresentation to the insurer's detriment is essential if the insurer seeks to void the policy because of a misrepresentation in the application").   In *Security Life & Trust Co. v. Jones*, 202 So. 2d 906  (Fla. 2nd DCA 1967), the court noted:

> If an insurer makes an independent inquiry and the circumstances are such that he is in a position to ascertain the facts by a reasonably diligent and complete search, he is bound by what a reasonably diligent and complete search would show. He

5

> cannot accept premiums with knowledge, actual or constructive, of facts sufficient
> to avoid the policy and later seek to escape liability on the basis of those facts.

*Id.* at 908 (citations omitted); *see also Lanigan*, 154 Fla. at 768 ("Having declined to rely solely upon the answers contained in the application forwarded by the medical examiner, and having made independent investigation elsewhere, it follows that the company is charged with all the knowledge which it might have obtained had it pursued the inquiry to the end with reasonable diligence and completeness.")

In *Beach Bars USA*, the insurer sought to avoid coverage under a policy it issued following a loss based on misrepresentations in the application for insurance. Following issuance of the policy, the insurer sent a loss control specialist to inspect the two insured locations. As a result of the inspection, the insurer had "knowledge of the inaccuracies" in the application. 2014 WL 12469970 at *2. Rather than cancel the policy, however, it renewed it the following year. *Id.* In connection with the renewal, another loss control inspection was performed. *Id.* Once again, the insurer was aware of issues with the risks it was insuring. Nonetheless, it took no action. It was not until a loss occurred that the insurer sought to rescind the policy.

The court noted that in order to obtain rescission, the alleged misrepresentations in the application must be material. According to the court:

> The evidence is conclusive that Plaintiffs' misrepresentations were not material to Indemnity's decision to issue the insurance policies at the premium rate in which they were issued. Indemnity actually knew, or should have known, about all of the alleged misrepresentations before issuing, and later renewing, the policies at issue when its loss control specialists conducted their loss control inspection of the premises for the purpose of ascertaining the "insurability or premiums to be charged."

*Id.* at *4. Consequently, "[b]ecause Indemnity was made aware of the identified misrepresentation either through responses to other sections of the application, or via its loss

control inspection, and issued—and re-issued—the policies notwithstanding," it was not entitled

to rescission under Fla. St. §627.409.  *Id.* at *4.

    Similarly, in *Fecht v. Makowski*, 172 So.2d 468, 471 (Fla. 3rd DCA 1965), another

rescission case, the court concluded that the insurer "did not rely upon the application by virtue

of the fact that it twice conducted its own inspection of the property independent of the agent and

the statement attributed to the insured in the application."  At issue in that case was whether the

insurer knew that the insured owned a motor boat.

    In *Vega v. Independent Fire Ins. Co.*, 651 So.2d 743 (Fla. 5th DCA 1995), yet another

rescission case, the insured argued that the *Fecht* case stands for the proposition that any time

"an insurance company undertakes its own investigation, it must perform that investigation with

reasonable diligence, and the company will be viewed as having all of the knowledge which that

diligent investigation might have turned up."  *Id.* at 743.  Both the trial court and the appellate

court rejected that argument.   The appellate court noted:

> Such a rule of law discourages any independent investigations by insurance
> companies and encourages applicants to lie; both results evincing poor social
> policy and contrary, as we read *Johnson*, to the rule advocated by the Florida
> Supreme Court.

*Id.* at 745.  In *Johnson v. Life Ins. Co. of Georgia*, 52 So.2d 813 (Fla. 1951), the insurer had

actual knowledge of the insured's medical condition, which would have allowed it to cancel the

policy, but it continued to collect the premiums.   *Id.* at 814-15; *Vega*, 651 So.2d at 745.

According to the *Vega* court, actual or at least constructive notice is required in order for an

insurer to be barred from seeking to avoid coverage.

    Here, Great American is not seeking to void the Policy *ab initio* based on false statements

in the original application for insurance.  Rather, it is taking the position that no coverage exists

under the Policy based on well-established principles of Florida insurance law and specific

policy exclusions.  Thus, the cases relied on by Plaintiffs have no application here.  Moreover, even if the cases did apply, there is no evidence that Great American had actual or constructive notice of the decay and deterioration of the structural support members, and Great American denies having any such notice.

Finally, it should be noted that the loss prevention inspection was conducted in May 2011, after issuance of the first policy by Great American.  Subsequent policies were issued by Great American, and went into effect, on March 1, 2012, and March 1, 2013.  In connection with those policies, Plaintiffs failed to disclose that they were aware of significant rot and deterioration to the structural elements of the Premises.  By the time the 2013 policy went into effect—which is the only policy at issue in this action—Plaintiffs clearly knew about the damage and had already taken remedial measures that were kept secret from, and undisclosed to, Great American.  No loss prevention inspections were conducted in 2012 or 2013.  Thus, failure to disclose the existence of the damage could bar coverage under the 2013 policy, which is the only policy Plaintiffs have sued under.

The Policy, for good reason, requires all insureds to "[G]ive us prompt notice of the loss or damage … ."  It is important to note that the first notice of loss given to Great American was delayed by the insured until on or about May 9, 2013.

## POINT II

### THE DAMAGE DID NOT COMMENCE DURING THE
### POLICY PERIOD AND THE LOSS WAS NOT FORTUITOUS

Under Florida law, "an insured seeking coverage pursuant to an 'all-risk []' policy must prove that a loss occurred to the property during the policy period." *Citizens Prop Ins. Corp. v. Munoz*, 158 So. 3d 671, 674 (Fla. 2d DCA 2014).  As set forth above, the loss at issue commenced between May 2009, the date of the recertification inspection, and August 2010, the

date Optimus was first called to the premises.  The damage that was observed in 2012 and 2013 was just a progression of the earlier damage.  [D.E. 79-5, 78:17-23; D.E. 79-2; D.E. 79-18, 61:15-62:21, 68:6-25, 126:6-17; D.E. 79-20, 97:3-23; D.E. 79-13, at pages 9-10; 79-14, at page 8.]  There is no evidence that the loss or damage first commenced during the policy period, as required under the Policy.  [D.E. 1-2, at page 33, ¶H.]  Plaintiffs have not been able to retain an affirmative expert who has opined otherwise.[7]  As such, Plaintiffs cannot establish that they sustained a covered loss.[8]

In *Garcia v. Federal Insurance Company*, 2017 WL 3706695 (M.D. Fla. April 17, 2017), the district court dismissed a homeowner's claim for breach of contract against its insurer for failure to cover property damage revealed during a home inspection. The district court awarded summary judgment, finding, in part, that the insured could not establish that the property damage occurred during the policy period.  *Id.*, at *5-6. The insurer had submitted reports from two separate engineers finding that several of the specific types of damage were present several years prior to the policy period and were long-term conditions. The insured failed to submit any contradictory evidence and conceded that he was uncertain when the damage occurred. In dismissing the insured's claim, the district court observed that "[t]hough not all of the damage present in 2014 was present at the property in 2012, [the insured] has failed to set forth evidence to suggest that any of the damage occurred during the policy period." *Id.*

Here, Plaintiffs have failed to present any evidence to suggest that the damage that forms the basis of their claim commenced between the date the Policy incepted and the date they provided notice of the loss to Great American, or that the damage is separate and distinct from

---

[7]  Plaintiffs have only retained a rebuttal expert.

[8]  Although Great American issued coverage to Plaintiffs for several previous policy periods, Plaintiffs have only sought coverage in this lawsuit under the policy issued for the one-year period commencing on March 1, 2013.  [D.E. 1-2, at page 7, ¶8.]

the damages observed by Optimus and Hillman Engineering in 2010 and 2012. To the contrary, the indisputable facts demonstrate that the damage did not commence during the policy period. Rather, it was the product of a long-term condition.

In addition, it is well established that "Florida's insurance laws embody the fortuity and known loss principles, precluding coverage for losses that have already taken place." *Interstate Fire & Cas. Co. v. Abernathy*, 93 So. 3d 352, 358 (Fla. 1st DCA 2012); *LaMadrid v. Nat'l Union Fire Ins Co.*, 567 Fed. Appx. 695, 701 n. 9 (11th Cir. 2014); *see also National Union Fire Ins. Co. v. Stroh Cos.*, 265 F.3d 97, 106 (2d Cir. 2001) ("The 'known loss' defense is a variation on the fortuity theme. It holds that 'an insured may not obtain insurance to cover a loss that is known before the policy takes effect.'"). Based on the evidence, it is clear that the loss was in progress and known by Plaintiffs prior to the inception of the Policy and, therefore, was not fortuitous.

Despite this evidence, Plaintiffs claim that the loss was fortuitous because it was caused by "a broken water pipe actively discharging volumes of water onto the sill plates supporting the midline of the structure." [D.E. 78, at page 1.] Plaintiffs further claim that this alleged leak caused the sill plates to fail. [D.E. 78, at page 1.] Plaintiffs have failed to offer any evidence to support this theory. [9] While Plaintiffs provided Great American during the adjustment process a video showing water leaking in the crawl space, they have failed to offer any proof as to where the water was leaking from, how long the leak lasted, when it first was discovered, or whether the alleged leak could cause damage to the sill plates. [10] Significantly, Plaintiffs rebuttal expert

---

[9] Plaintiffs claim that this one leaky pipe caused over $2.4 million in damages. [D.E.1-6.]

[10] In addition, the evidence establishes that the wet conditions in the crawl space both pre-date and post-date the alleged pipe leak. Specifically, there is evidence of water leaking in the crawl space in 2009 (Exhibits F and I), Henry Hillman testified that the crawl space was wet when he inspected it in 2012 [D.E. 79-18, 93:24-94:11, 95:1-9, 108:19-23], and Great American's

testified that "it can take a good year" for a leaky water pipe to cause deterioration of the sill plates, which would consequently take the commencement of the loss outside the policy period. [D.E. 77-3, 26:18 – 27:14.]  Moreover, had the pipe been leaking from 2012 through 2013, it clearly would have been noticed by the three structural engineers who were working at the Premises during that time period.

Finally, the photographs of the cement beams taken in 2013 show that the sill plates were located on top of the floor joists and not under the floor joists as Plaintiffs claim.  [D.E.79-13, at pages 40-41, Photographs 27-30; D.E. 79-14, page 26-27, Photographs 23-26.]  Indeed, the repair details prepared by THM confirm that the floor joists sat on the concrete beams and the "Damaged/Deteriorated Double Sill Plate to be Replaced" sat on top of the joists.  (*See* Wilson Dec., Exhibits D and E.)  It is the sill plates on top of the joists, which would not have been impacted by the alleged pipe leak, that Great American's experts noted have failed.

<div align="center">

**POINT III**

**COVERAGE IS BARRED BECAUSE PLAINTIFFS MISREPRESENTED
AND/OR CONCEALED FACTS DURING THE ADJUSTMENT OF THE LOSS**

</div>

Shortly after being advised of the existence of the loss, in correspondence dated May 24, 2013, Great American first requested, *inter alia*, that Plaintiffs provide "[a]ll reports and analyses concerning the nature and extent of the loss or damage at the Building and recommended repairs and/or remediation," "[a]ll documents and records pertaining to any inspection(s) of the loss or damage at the Building, including but not limited to all inspection reports prepared by any consultant(s), architect(s) or engineer(s) acting on behalf of Estefan," and "[a]ll records of repairs, renovations and/or maintenance related to any of the elements of the Building included

---

consultants observed wet conditions in the crawl space during their 2016 inspection, which took place after the renovations were performed [D.E. 79-13, page 10; D.E. 79-14, page 9].

within this claim from January 1, 2008 to present." [D.E. 79-15.]   Great American also requested on numerous subsequent occasions that Plaintiffs provide them with all documents concerning any inspections of the Premises that took place prior to Great American first receiving notice of the claim, including those by Hillman Engineering.

By letter dated April 14, 2017, Stephen A. Marino, Esq., counsel for Plaintiffs stated:

> We consulted with Messrs. Hillman, Benson, and Garcia.  They do not have, and state that they never had, any of the documents that you persist in requesting. And my client again performed a thorough search and again found no relevant documents beyond the volumes of information that was previously provided.[11]

[D.E. 79-16.]  That statement was false.  Messrs. Hillman, Benson, and Garcia all had responsive documents that were not provided to Great American by Plaintiffs.[12]   Optimus also had documents responsive to Great American's requests that were not provided.   In addition, Plaintiffs clearly were in possession of the Optimus reports and related documents as well as various documents and correspondence prepared by Messrs. Hillman, Benson, and Garcia, all of which showed "damage at the Building."[13]

It was not until Optimus's 2010 inspection report was produced by a third party in response to a subpoena issued during the discovery phase of this litigation that Great American first learned of Optimus's involvement. [D.E. 79-1, ¶53.]  During the subsequent deposition of their corporate representative, Plaintiffs finally produced a copy of Optimus's 2012 inspection

---

[11] During the adjustment process, Plaintiffs produced just a few e-mails and related documents prepared by Hillman Engineering.

[12] Mr. Hillman testified that he does not recall ever being asked for a copy of his file prior to receiving the subpoena served by Great American in this action.  [D.E. 79-18, 52:15 – 53:2.]

[13] Plaintiffs claim that Great American "spent … four years 'investigating' the claim [and] it has not made a coverage determination."  [D.E. 78, page 2.]  It fails to mention that during those four years Great American kept requesting documents concerning the cause of the damage and Plaintiffs failed to cooperate by concealing the existence of the documents.  It was the insured's concealment and failure to cooperate that delayed Great American's coverage investigation.

report.  [D.E. 79-1, ¶54.]   In addition to producing the 2012 Optimus inspection report, Plaintiffs produced certain other documents prepared by Messrs. Hillman, Benson, and Garcia in this litigation.  All of those documents clearly were material to Great American's investigation of the loss and its ultimate coverage determination.

The Policy provides:

**A.      Concealment, Misrepresentation Or Fraud**

The Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1.      this Coverage Part;

2.      the Covered Property;

3.      your interest in the Covered Property; or

4.      a claim under this Coverage Part.

 [D.E. 1-2, at page 33.]  Here, Plaintiffs misrepresented and/or concealed the fact that they were aware of damage to the Premises as early as August 2010 and that they knew the cause of that damage was deterioration and rot no later than April 2012.  Indeed, by June 2012, they started taking remedial measures by putting shoring in place.  [D.E. 79-19.]  Consequently, coverage for the loss is barred.[14]  *See Michigan Millers Mut. Ins. Co. v. Benfield*, 140 F.3d 915, 923 (11th Cir. 1998) ("the law of this Circuit is clear that this court will not require that an insurer demonstrate that it relied on the insured's misrepresentations when asserting a policy defense on fraud; that a

---

[14] Plaintiffs' failure to produce the documents also may qualify as a failure to cooperate.  The Policy provides that in the event of a loss, the insured "must … Cooperate with [Great American] in the investigation … of the claim."  [D.E. 1-2, at page 35, ¶C.]  By not producing the documents that were requested, and even going so far as to deny they existed, Plaintiffs have failed to cooperate with Great American.  *See El Dorado Towers Condo. Assoc., Inc.*, 717 F. Supp. 2d 1331, 1321 (S.D. Fla. 2010).

material fraud was perpetrated by an insured in pursuing an insurance claim is sufficient.")

## **CONCLUSION**

For the foregoing reasons, Great American respectfully requests that the Court deny Plaintiffs' motion for partial summary judgment in its entirety. Great American further submits that pursuant to Rule 56(f) of the Federal Rules of Civil Procedure the Court should grant summary judgment in Great American's favor based on the fortuity/known loss defenses, the fact that Plaintiffs have not established that the loss commenced during the policy period, and the fact that Plaintiffs concealed and/or misrepresented information concerning the cause of the loss during the adjustment process.

Dated: January 12th, 2018

Respectfully submitted,

MOUND COTTON WOLLAN & GREENGRASS LLP

By:      s/ Brian M. McKell
         William D. Wilson, Esq. (Fla. Bar No. 71202)
         wwilson@moundcoton.com
         30A Vreeland Road
         Florham Park, NJ 07932
         Tel. (973) 494-0600
         Fax (973) 242-4244

         Brian M. McKell, Esq. (Fla. Bar No. 975753)
         bmckell@moundcotton.com
         Lionel F. Rivera, Esq. (Fla. Bar No. 88795)
         lrivera@moundcotton.com
         Brooke D. Oransky (Fla. Bar No. 113049)
         boransky@moundcotton.com
         101 N.E. Third Avenue, Suite 1500
         Fort Lauderdale, FL 33301
         Tel. (954) 467-5800
         Fax (954) 467-5880

         *Counsel for Defendant,*
         *Great American Ins. Co. of New York*

14

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January  12<u>th</u>, 2018, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being

served this day on all counsel of record identified on the attached Service List via transmission of

Notices of Electronic Filing generated by CM/ECF.

<div style="margin-left:40%">

s/ Brian M. McKell
Lionel F. Rivera, Esq. (Fla. Bar No. 88795)
lrivera@moundcotton.com
Mound Cotton Wollan & Greengrass LLP
101 N.E. Third Avenue, Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 467-5800
Fax (954) 467-5880

*Counsel for Defendant,*
*Great American Ins. Co. of New York*

</div>

1

<u>**SERVICE LIST**</u>

<u>**The S.O. Beach Corp., et al. v. Great American Ins. Co. of New York**</u>

**CASE NO.: 17-cv-22254-FAM**

**United States District Court, Southern District of Florida**

Stephen A. Marino, Jr.
Ver Ploeg & Lumpkin, P.A.
100 S.E. Second Street, 30th Floor
Miami, FL 33131
Tel. (305) 577-3996
Fax (305) 577-3558
*Counsel for Plaintiffs,*
*The S.O. Beach Corp., and*
*Larios on the Beach, Inc.*