UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 17-22254-CIV-MORENO

THE S.O. BEACH CORP. and LARIOS ON
THE BEACH, INC.,

    Plaintiffs,

vs.

GREAT AMERICAN INSURANCE
COMPANY OF NEW YORK,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### I. INTRODUCTION

As a result of a lingering insurance coverage dispute, the S.O. Beach Corporation and Larios on the Beach, Inc. filed this action against Great American Insurance Company of New York, seeking coverage for damage to their Miami Beach property. Following discovery, Great American filed a motion for summary judgment, arguing that the applicable insurance policy provides no coverage for the alleged property damage. Plaintiffs filed a cross-motion for partial summary judgment as to Great American's coverage defenses, contending that the alleged loss materialized during the policy period. For the reasons discussed below, Great American's motion for summary judgment is GRANTED and Plaintiffs' motion for partial summary judgment is DENIED.

### II. FACTUAL BACKGROUND

The S.O. Beach Corporation and Larios on the Beach, Inc. own a three-story building ("the Building") on Miami Beach's iconic Ocean Drive. The Building was constructed in 1930 and Plaintiffs purchased it in 1992. Plaintiffs operate a restaurant out of its first floor.

A. **Before the Policy Period**

In 2010, Plaintiffs retained Optimus Structural Design LLC to visually inspect the Building and evaluate its structural components. Optimus's inspectors discovered that the Building's wood framing and foundations showed "signs of settlement and severe deflections." (Def's Mot. at 2, Exhibit A at 4.) Following its inspection, Optimus drafted a report stating that (i) "[e]xisting structural members (wood framing, piers, foundations) in the kitchen and storage areas must be reinforced[,]" (ii) "[s]tructural framing in the areas with deflections may have to be elevated with hydraulic jacks to its original position[,]" and (iii) "[t]he current condition of the interior framing which has signs of severe deflections has to be addressed as soon as possible." (Def's Mot. at 2, Exhibit A at 4.) Despite Optimus's recommendations, Plaintiffs did not take any action to cure these structural issues until 2012.

On March 1, 2011, Great American began insuring the Building under a separate policy unrelated to the policy at issue. In connection with that policy, Great American conducted a loss prevention inspection of the Building in May 2011. The inspection report graded the Building's construction quality as "good" and indicated that there was no evidence of water damage and that Plaintiffs were appropriately controlling exposure to loss.

On February 21, 2012, Plaintiffs once again retained Optimus to furnish structural engineering services. According to the engagement letter, Optimus agreed to design the "required structural repairs for the deteriorated existing structural elements uncovered during (sic) inspection process and outlined in our inspection report dated September 3, 2010." (Def's Mot. at 2, Exhibit B at 1.) Optimus performed the inspection on April 26, 2012 and noted the following in its inspection report:

> (1) All existing joists and 1x6 T&G wood sheathing in both kitchens are deteriorated (rotted) and require replacement.
>
> (2) Two existing concrete beams were observed in the crawl space which support existing load bearing walls of the corridors. . . . These beams appear to be in fair condition.

2

> (3) Shoring and re-shoring must be installed as per attached diagram. It is recommended that one part of the kitchen is (sic) closed.

(Def's Mot. at 2, Exhibit D at 2.) Plaintiffs installed temporary shoring in June 2012 pursuant to Optimus's recommendations.

Plaintiffs subsequently terminated Optimus and engaged Hillman Engineering to provide professional engineering services and evaluate the repair plans drafted by Optimus. Hillman agreed to "examine the existing structural elements of the [Building] to determine if the scope as proposed by [Optimus] is sufficient and all encompassing." (Def's Mot. at 2, Exhibit F at 2.) It also agreed to produce a complete bid package so that Plaintiffs could "obtain competitive bids for the reconstruction of the building." (Def's Mot. at 2, Exhibit F at 2.)

Ronald Benson of Hillman Engineering inspected the Building on October 18, 2012. Benson then emailed Ricardo Dopico—Chief Corporate Council for the S.O. Beach Corp.—to inform him that the inspection identified "sagging joists and areas of decking" that had completely rotted out and that the Building required additional shoring. (Def's Mot. at 2, Exhibit G at 1.) Benson also stated in his email that "the existing condition of the structure poses a life safety hazard and the shoring we have specified needs to be put in place immediately." (*Id.*) Shortly after Benson sent this email, Plaintiffs terminated their agreement with Hillman.

## B. **During the Policy Period**

On March 1, 2013, the Plaintiffs' insurance policy ("2013 Policy") went into effect. Great American previously insured the same property under two consecutive yearlong policies commencing on March 1, 2011 and March 1, 2012. However, Plaintiffs' Complaint alleges losses under only the 2013 Policy.

One month later, Plaintiffs retained Thomas Moe of THM Structural Consulting to evaluate the condition of the Building. In his April 10, 2013 engagement letter, Moe explained that "[t]he scope of our work will be to identify the cause of the structural deficiencies within the 3-story building specifically related to the interior of the structure." (Def's Resp. to Pl's Mot. at

2, Exhibit W at 1.) He noted in the same letter that "[v]isual observations of the current issues include: sagging, tilting, and deflection of interior floors and corridors; cracking of interior walls within corridor." (*Id.*) During the inspection on April 19, 2013, Moe allegedly discovered a deteriorating sill plate[1] on the first floor. He recommended that Plaintiffs close the restaurant and evacuate the Building. Around the same time, Plaintiffs allege that they discovered a broken pipe gushing water onto the sill plates and into the crawl space beneath the Building's first floor.

Plaintiffs subsequently informed Great American of their property damage claim. Plaintiffs submitted a Property Loss Notice on May 9, 2013 claiming they "found some structural damage due to water." (Def's Mot. at 4, Exhibit I at 1.) Plaintiffs stated in the notice that the loss occurred on May 2, 2013 at 12:00 p.m. However, Plaintiffs later asserted in their Sworn Statement in Proof of Loss that the "property damage and business interruption loss was discovered on or about Friday, April 19, 2013." (Def's Mot. at 10, Exhibit S at 1.) Plaintiffs' claim totals $2,400,143, including $906,294 for building loss and $1,493,849 for business income loss.

## C. <u>Investigation of Plaintiffs' Property-Loss Claim</u>

Great American initiated an investigation of the Building following Plaintiffs' claim and retained SDII Global Corporation to help determine the cause of the property damage. SDII Global inspected the Building three times in May 2013 to "determine the cause, duration, and extent of the damage to the ground floor of the building" and "to evaluate the 'sagging' of the second and third stories of the building and determine its relation to the building foundation and ground floor condition." (Def's Mot. at 4, Exhibit K at 1.) It concluded that "the damage to the wood sill plate of the load bearing stud walls of the corridor and the wood joist of the floor framing the ground level was the result of moisture exposure for an extended period of time,"

---

[1] A sill plate is a pressure-treated board that sits flat on a cement surface and supports the floor trusses. In Plaintiffs' Building, the sill plates rested on the center load bearing concrete beams supporting the central load bearing walls.

4

adding that "[t]he extent and severity of decay on these wood building components indicated continuous moisture exposure for several years." (*Id.*)

During the latter stages of the investigation, Great American hired Wood Advisory Services, Inc. to inspect the building and provide another causation opinion. It visually evaluated the premises on October 27, 2016 and, like SDII Global, determined that the damage occurred over a period of years as a result of long-term deterioration brought on by moisture exposure. Wood issued the following opinions on the cause of the Building's structural deficiencies:

1. The deterioration of the subfloor, floor joists, wall studs, and sill plates identified by the insured due to negative vertical deflections was caused by long-term deterioration from wood decay.

2. The long-term decay was caused by a generally high relative humidity in the crawlspace, combined with generally cool interior air conditioned restaurant space resulting in condensation on the subfloor and floor joists.

3. The generalized long-term decay was progressive and occurred over a period of many years as evidenced by the 2010 Optimus report and most likely over several decades based on decay rates in peer reviewed scientific articles

(Def's Mot. at 4, Exhibit L at 8.)

As of June 2017, Great American still had not issued a decision on whether the 2013 Policy covered the property damage alleged in Plaintiffs' claim. Plaintiffs therefore initiated this action on June 6, 2017 seeking recovery from Great American for their alleged loss.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is authorized where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential

5

elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-movant must present more than a scintilla of evidence in support of the non-movant's position. A jury must be able reasonably to find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## IV. DISCUSSION

### D. The All-Risk Insurance Policy

Great American insured Plaintiffs' Building under an all-risk commercial property insurance policy, effective from March 1, 2013 through February 28, 2014. All-risk policies "cover all fortuitous losses or damages other than those resulting from willful misconduct or fraudulent acts." *Fayad v. Clarendon National Ins. Co.*, 899 So.2d 1082, 1086 (Fla. 2005). Under Florida law, courts must construe insurance contracts "in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the insurance policy is considered ambiguous." *Id.* Ambiguous insurance policy provisions—including ambiguous exclusionary clauses—are construed against the drafter and liberally in favor of the insured. *See id.* ("[E]xclusionary clauses are construed even more strictly against the insurer than coverage clauses.").

A plaintiff seeking to recover under an all-risks policy has the burden of proving that a loss occurred to the insured's property while the policy was in force. *Egan v. Washington Gen. Ins. Corp.*, 240 So. 2d 875, 876 (Fla. Dist. Ct. App. 1970). "Once the insured establishes a loss apparently within the terms of an 'all risks' policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted." *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So. 2d 565, 568 (Fla. Dist. Ct. App. 1984). Finally, "if the insurer meets its burden of proving that the loss is excluded, the burden then shifts back to the insured 'to establish that an exception

to an exclusion applies.'" *Bartram v. Landmark American Ins. Co.*, 864 F. Supp. 2d 1229, 1232 (N.D. Fla. 2012).

Although Plaintiffs' 2013 Policy excludes "collapse" from its list of covered causes of loss, it requires Great American to pay for physical loss of, or damage caused by or resulting from, a collapse as defined in the "Additional Coverages" section. The 2013 Policy defines a collapse as "an ***abrupt*** falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." "'Abrupt' is defined as 'characterized by or involving action or change without preparation or warning: unexpected.'" *Kings Ridge*, 98 So. 3d at 77 (citing *Merriam–Webster's Collegiate Dictionary* 4 (11th ed. 2008)). Thus, to obtain collapse coverage, Plaintiffs must establish that while the 2013 Policy was in effect, some part of the Building ***suddenly*** fell down or caved and prevented Plaintiffs from operating their first-floor restaurant.

### E. Policy Coverage Analysis

Plaintiffs contend that "deteriorated sill plates caused a downward shift in the building's central structure and required evacuation." (Pl's Resp. at 4.) However, Plaintiffs have provided no affirmative expert opinion or documentary evidence showing that the alleged damage actually satisfies the criteria for a covered collapse under the 2013 Policy. In contrast, Great American has produced two expert opinions, documentary evidence, and testimony from fact witnesses establishing mutliple reasons Plaintiffs' property damage is not covered. Ultimately, the evidence indicates the damage occurred gradually over an extended period of time and that Plaintiffs knew about the Building's gradual deterioration well before the date they allege the collapse occurred. As such, Plaintiffs cannot prove that any portion of the Building ***abruptly*** fell down or caved in during the 2013 Policy[2] period and, thus, cannot survive Great American's motion for summary judgment.

---

[2] Plaintiffs' complaint alleges losses under the 2013 Policy *and only the 2013 Policy*. To be sure, Plaintiffs contend in their response to Great American's motion for summary judgment that Great American insured the same Building under two separate policies from March 1, 2011 through February

7

### *1. No Evidence that the Building Suddenly Fell or Caved In During the Policy Period.*

According to Plaintiffs, the sill plate deterioration caused the Building's floors and ceilings to unexpectedly drop after the 2013 Policy's coverage commenced. They emphasize the similarities between this case and *Kings Ridge Community Ass'n, Inc. v. Sagamore Ins. Co.*, 98 So. 3d 74 (Fla. 5th DCA 2012). In *Kings Ridge*, the District Court of Appeal of Florida found for the insured, holding that a collapse occurred where a specific incident caused a building's ceiling to unexpectedly and immediately deflect downward twelve inches. *Id.* at 77–78. Plaintiffs urge this Court to follow suit, noting that this case and *Kings Ridge* involve similar property damage and identical policy language.

However, *Kings Ridge* differs from this case in one decisive respect. In that case, the Court held that the property damage occurred abruptly. Plaintiffs, on the other hand, have provided no affirmative expert opinion or documentary evidence establishing that any part of their Building abruptly fell or caved in between March 1, 2013—the date coverage began under the 2013 Policy—and May 9, 2013—the date Plaintiffs notified Great American of the alleged loss.

In *Kings Ridge*, the record clearly established a single moment when, without preparation or warning, the building's ceiling fell twelve inches. The Court noted that "on February 24, 2010, there was an unexpected change to the clubhouse when the exterior doors of the west wing of the clubhouse began to shake and the drop ceiling and soffits deflected downward[.]" *Id.* Before that incident, the building in *Kings Ridge* showed no signs of existing deficiencies or progressive deterioration. The Court explained that "[p]rior to the incident on February 24, 2010, the drop ceiling, flat roof, and trusses were upright on their base and had remained at the same

---

28, 2013. However, they failed to mention those earlier policies in their complaint and thus do not state claims for losses under those policies. In a footnote of their response brief, Plaintiffs suggest the Court should grant them leave to amend their complaint if "the Court [determines] that coverage exists under the previous policies issued by Great American, or the facts produced at trial show that a prior Great American [policy] was implicated." (Pl's Resp. at 14, n.8). The Court will not indulge Plaintiffs' delayed, conditional request for leave to amend its complaint. And even if Plaintiffs had brought claims under the 2011 and 2012 policies, they still could not survive summary judgment because they have failed to provide any evidence that a collapse occurred during either of the earlier policy periods.

8

level, degree, and amount of height for an indeterminate period." *Id.* But at the time of the incident, those structural elements "collapsed immediately"—*i.e.*, "they were no longer upright on their base; they were no longer at the same level, degree, or amount of height that they had previously maintained." *Id.*

In this case, however, Plaintiffs have provided no evidence of a similarly abrupt deflection of the Building's floors or ceilings. To begin, Plaintiffs cited conflicting dates of the alleged collapse. They initially said the collapse occurred on May 2, 2013, but later stated it occurred on April 19, 2013. Furthermore, neither Aldo Garcia, the Building's architect, nor Thomas Moe, Plaintiffs' third structural engineer, testified that the property damage occurred suddenly. They stated simply that as of April 2013, the Building "was starting to cave in" (Garcia Dep. at 92:8–12) and was "structurally unsafe." (*Id.* at 88:8–16.) This testimony is irrelevant, however, because Great American does not dispute the existence of structural defects in May 2013. To the contrary, it argues—and the evidence confirms—that those same defects existed years before the claimed collapse. Thus, unlike *Kings Ridge*, the evidence in this case suggests the property damage did not abruptly materialize—or for that matter, abruptly worsen—during the 2013 Policy period.

To rebut the evidence showing the Building never abruptly fell or caved in, Plaintiffs offer only inaccurate and conclusory assertions. They first argue that "at no point prior to the 2013 discovery of the deteriorated sill plates was it declared that the building was in a state of collapse, [or] that the structure dropped to a lower degree in level . . . ." (Pl's Resp. at 6.) This contention conflicts with Optimus's 2010 inspection report explicitly stating that the Building showed signs of settlement and severe deflections. Next, Plaintiffs contend that prior to 2013, nobody determined "the structure could not be occupied for its intended purpose." (Pl's Resp. at 6.) Once again, Plaintiffs' assertion does not square with the facts in the record. Following its April 2012 inspection, Optimus recommended Plaintiffs close one part of the kitchen. Additionally, Robert Benson of Hillman Engineering told Plaintiffs' Corporate Counsel in October 2012 that the Building's structural deficiencies created a "life safety hazard." Thus,

9

Plaintiffs received two warnings that all or part of the Building could not be occupied for its intended purpose. The Building remained occupied until May 2013 only because Plaintiffs ignored those warnings.

Ultimately, the evidence indicates that Plaintiffs' property damage resulted from structural defects that existed for years and steadily deteriorated over time. Having failed to produce any evidence that the damage occurred suddenly, Plaintiffs' reliance on *Kings Ridge* is misplaced. Rather, the Court gleans more applicable guidance from cases involving similar coverage disputes where property damage occurred progressively over an extended period. *See, e.g., N.P.V. Realty Corp. v. Nationwide Mut. Ins. Co.*, 2011 WL 4948542, *4 (M.D. Fla. 2011) (addressing whether "damage that occurred gradually over a period of time" qualified for coverage as a "collapse"). Based on those cases, the gradually occurring deterioration of Plaintiffs' Building does not qualify as a covered loss given that the applicable policy defines a collapse as an "abrupt falling down or caving in." *See id.*; *see also Ass'n of Unit Owners of Nestani v. State Farm Fire & Cas. Co.*, 670 F. Supp. 2d 1156, 1163 (D. Or. 2009), *aff'd sub nom. Ass'n of Unit Owners of Nestani-A Grecian Villa v. State Farm Fire & Cas. Ins. Co.*, 434 F. App'x 579 (9th Cir. 2011) (holding that where Plaintiff's alleged "collapse" "resulted from water damage and decay 'occurring over a period of time,' this 'collapse' was not 'sudden' under the terms of the Policy"); *Zamichiei v. CSAA Fire & Cas. Ins. Co.*, No. 3:16-CV-739 (VAB), 2018 WL 950116, at *4 (D. Conn. Feb. 20, 2018) (holding that "progressive deterioration" did not constitute a covered collapse where the applicable policy covered only "'an abrupt falling down or caving in of a building' . . . and not the gradual deterioration of property over time"); *Holiday Vill. E. Homeowner's Ass'n v. QBE Ins Corp.*, 517 F. App'x 113, 114 (3d Cir. 2013) (noting that the term "abrupt" "narrows the meaning of 'collapse' under the Policy by limiting coverage to an immediate, rather than gradual, collapse").

### 2. *Knowledge of Gradually Worsening Deterioration Precludes Coverage.*

Despite case law suggesting that gradual damage does not qualify as an "abrupt falling down or caving in," Plaintiffs maintain that the Building's progressive, years-long deterioration nonetheless constitutes a collapse. But the cases they cite in support of this position do not apply. Each involves hidden defects in buildings that, unlike Plaintiffs' Building, previously showed no signs of structural deficiencies before the alleged loss materialized. *Johnston v. Companion Prop. & Cas. Ins. Co.*, 318 F. App'x 861, 866 (11th Cir. 2009) (affirming judgment for the insured where decay was "hidden from view"); *Kelly v. Balboa Ins. Co.*, 897 F. Supp. 2d 1262, 1268 (M.D. Fla. 2012) (denying summary judgment where genuine issue of material fact existed as to whether Plaintiff knew of the structural decay caused by termites); *The Oaks Unit III Condo. Ass'n, Inc. v. Allstate Ins. Co.*, 2010 WL 4542899, at *1 (M.D. Fla. Nov. 10, 2010) (same).

That distinction proves fatal to Plaintiffs' position that gradual deterioration may qualify as a collapse. Courts hold that insureds with knowledge of pre-existing deterioration cannot recover for damage caused by the worsening of that deterioration. *See Sandalwood Condo. Ass'n at Wildwood, Inc. v. Allstate Ins. Co.*, 294 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003) ("[I]n order to recover under the policy, [the insured] must demonstrate that the damage to the structural integrity of the Complex was not visible and that [the insured] neither knew nor should have known of the structural damage with sufficient time to allow for repairs before it reached the stage of 'collapse.'").

As already discussed, Optimus and Hillman documented the Building's gradually deteriorating structure no later than 2012. The evidence leaves no doubt that Plaintiffs knew about this progressive deterioration. First, engineers from both firms drafted reports detailing the Building's structural deficiencies after each inspection. Second, Plaintiffs retained Optimus to design "required structural repairs for the deteriorated existing structural elements" and engaged Hillman to produce a complete bid package to garner "competitive bids for the reconstruction of the building." (Def's Mot. at 2, Exhibit B at 1 and Exhibit F at 2.) Third, Hillman's structural engineer sent an email to Plaintiffs' corporate counsel in October 2012 explaining the severity of

11

the Building's structural deterioration and calling the Building a "life safety hazard." (Def's Mot. at 2, Exhibit G at 1.) Because Plaintiffs received inspection reports and emails detailing the structural problems and recommending immediate repairs, the Court cannot accept Plaintiffs' conclusory statement that they had no knowledge of the Building's deterioration.[3]

## V. CONCLUSION

For the reasons discussed above, Great American's motion for summary judgment is GRANTED and Plaintiffs' motion for partial summary judgment is DENIED. It is also ADJUDGED that all other pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 10th of April 2018.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[3] Furthermore, Plaintiffs' contention that it lacked knowledge of the deteriorated sill plates (*i.e.*, the cause of the damage) is irrelevant because the evidence indicates Plaintiffs knew about the sinking ceilings and floors (*i.e.*, the damage itself). *Sandalwood*, 294 F. Supp. 2d at 1319 (holding that, even where the insured lacked knowledge of the specific defect that caused the damage, the insured still could not recover under the policy if the "*damage* to the structural integrity of Complex was [] visible" or the insured "knew [or] should have known of the structural *damage* with sufficient time to allow for repairs before it reached the state of 'collapse'") (emphasis added).